**AFFIRM; and Opinion Filed July 17, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-16-00810-CR

**MYO NAING SWE, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 282nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1475492-S**

## MEMORANDUM OPINION
Before Justices Francis, Brown, and Schenck
Opinion by Justice Brown

Following a jury trial, Myo Naing Swe appeals his conviction for murder. In four issues, appellant contends the evidence is insufficient to support the jury's rejection of both self-defense and sudden passion, the trial court erred in excluding evidence relevant to self-defense, and the trial court violated his right to allocution. We affirm the trial court's judgment.

### BACKGROUND

The indictment alleged appellant intentionally and knowingly caused the death of Anthwan Clinton by striking Clinton with a hammer. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). The indictment alleged in the alternative that appellant intended to cause serious bodily injury to Clinton and committed an act clearly dangerous to human life, striking Clinton with a hammer, and thereby caused Clinton's death. *Id.* § 19.02(b)(2).

The jury trial in this case lasted just over a week, and there were more than fifteen witnesses. We limit our recitation of the facts to those necessary to resolve the issues in this appeal. There is no dispute that Clinton died as a result of injuries inflicted by appellant. Clinton's older brother Reginald testified that Clinton hung out several days a week in a high-crime area known as Five Points with appellant and others. They smoked "K2," a synthetic drug. When Clinton did not come home one night, Reginald went to look for Clinton and found him dead in appellant's apartment. Appellant fled to Mexico after the incident. When he tried to return to the United States a short time later, appellant told a customs agent at the border that he had killed a man in Dallas.

Appellant waived his rights and chose to speak to Agent Paulo Lozano with the Department of Homeland Security at the border. Lozano contacted the FBI about the situation. FBI Special Agent Gregory Bostic arrived and sat in on the interrogation. Lozano and Bostic both testified about what appellant told them. Lozano testified appellant told him that on about March 24, 2014, he had been hanging out with friends at his apartment, including Clinton.[1] Appellant had been smoking marijuana and said Clinton had been smoking PCP. Appellant said Clinton began acting strangely. Clinton came at appellant and attempted to rape him. Clinton said, "Let's do it for the Illuminati." Appellant became angry and told the victim, "Don't ever come at me like that or I will kill you." The others present separated them. Appellant told the others to leave, but Clinton stayed. Appellant and Clinton watched movies on appellant's phone and fell asleep on the floor. Sometime later, appellant woke up and began thinking about the prior altercation with Clinton. Appellant became angry. He retrieved a hammer from his closet. While Clinton was sleeping, appellant hit him in the head with the hammer about five times. Clinton began to scream. Appellant covered Clinton's face with a pillow and with clothing and

---

[1] Appellant did not identify Clinton by name during the interview, but we do so for ease of reference.

pressed down until the victim died. Appellant then left the apartment. He later told his friend A. Soe that he had killed someone and took him to the apartment to show him the body. They decided it would be best to flee to Mexico. Appellant and Soe took the bus to Laredo and walked across the border to Nuevo Laredo. After a couple of days, they decided they could not stay in Mexico and walked back to the United States. Appellant told Lozano he was okay with what he had done and that he felt he had killed the victim for God. Agent Bostic's testimony about appellant's statements during the interrogation was similar to and corroborated Agent Bostic's.

Dallas Police Detective Derick Chaney found the hammer used to kill Clinton in a creek less than half a mile from appellant's apartment.

David Spence, supervisor of the trace evidence section at Southwestern Institute of Forensic Sciences (SWIFS) crime lab, performed a bloodstain pattern analysis in this case. Spence analyzed crime scene photographs, the autopsy report, items of the victim's clothing, and hair and fibers from the scene. Bloodstains were observed on the victim and his clothes, the carpet, the adjacent wall, and other items on the floor. Spence testified in detail about various bloodstain patterns at the scene. There were spatter bloodstains below and to the right of an electrical outlet consistent with a force being applied to a source of blood in the area near the outlet. Spence testified that the height of the spatter bloodstains on the wall was consistent with a source of blood being at the height of somewhere between the floor and the height of the outlet. He stated that the likely source of blood at the scene was the victim's head.

On cross-examination, Spence testified there was no evidence of spatter stains high on the wall. Spence could not rule out that the spatter stains were consistent with a person who was on his knees on all fours and struck in the back of his head. From the blood stain patterns, Spence could not rule out a scenario where the person was standing up, was struck twice with a

–3–

hammer, dropped to his knees, was struck again, and then was driven to the floor and given a shower of blows.

Dr. Candace Schoppe, a medical examiner with SWIFS, performed an autopsy on Clinton. The cause of death for Clinton was blunt force injuries of the head. She testified that the majority of his injuries were on the right side of his head. Some of the wounds were crescent shaped, which was consistent with being struck by a hammer. The doctor counted at least sixteen individual lacerations or defects. Schoppe stated that Clinton did not die instantly, but would not have survived more than a couple of hours. The victim would have been rendered unconscious fairly quickly. The location of the blows told Schoppe that the victim was probably positioned with the left side of his head toward the ground or away from the object striking him. The majority of the blows were to the back of the head. He also had cuts on his lip that were not consistent with being hit with a hammer in the mouth and were "maybe more from . . . falling." There was no evidence to indicate that the victim was alive and moaning and someone held a pillow over his face to get him to stop breathing. There was no evidence of suffocation.

The medical examiner also testified that Clinton had PCP in his system at a level of .03 milligrams per liter. The test for K2 in his system was negative. This type of drug is frequently modified to avoid detection. There was testimony from both the State and defense about the effects of PCP.

Appellant testified and presented a different version of events from the one he gave shortly after Clinton's death. Appellant first testified about an incident that occurred a couple of days before Clinton's death. Appellant, Clinton, and Reginald had gone to an apartment to get some PCP. Reginald went in to the apartment, and appellant and Clinton waited outside. A man came out and asked what they were doing there. Clinton said, "on blood," and Clinton and the

–4–

man started swinging. Appellant ran. Clinton and Reginald met up with appellant in about thirty minutes, but Clinton wanted to go back and continue to fight.

According to appellant, on March 23, 2014, appellant, Clinton, and two others, Prince Constant and Gediyon Assefa, got some PCP. They smoked it and K2. They were high and walked around for a couple of hours. They eventually went back to appellant's apartment where everyone but appellant smoked the remaining PCP. After that, Clinton got up and began making growling noises like a dog about to fight. Appellant also described the noise as a demonic voice. Clinton looked at appellant with a mean look. Clinton was standing and appellant was sitting. Clinton grabbed appellant's shirt and pulled him up off the ground. Clinton started swinging at appellant's head. Appellant testified Clinton beat him for about fifteen seconds. Appellant did not hit Clinton back. Clinton then pushed appellant to the ground and jumped on him, landing in between appellant's legs. Clinton then started ripping appellant's shirt. Clinton was between appellant's legs and he started putting his face "between [appellant's] neck." Appellant testified he thought Clinton was trying to rape him. Appellant told Assefa and Constant to get Clinton off of him. Assefa and Constant tried to help appellant and started pulling Clinton up. Appellant then pushed Clinton to the ground and slapped his face. Clinton was still making noises and he started rolling around on the ground. Appellant told the three men that they needed to leave.

All four men left the apartment together and started walking. Clinton would not talk and exhibited more strange behavior. Eventually, appellant started to walk home, and Clinton followed him to his apartment. Appellant told Clinton he could not come in. As appellant opened his apartment door, Clinton punched him in the back of the head. Appellant went to his closet, leaving the door to the apartment open. He heard glass break. Appellant got a hammer out of the closet for protection. When he turned around, he saw Clinton in the apartment. Appellant told him to get out, but Clinton walked toward appellant with a "mean face."

–5–

Appellant testified that he was scared. Clinton was "balling up his hands." Appellant took that to mean Clinton was going to hit him again. In appellant's mind, Clinton was going to kill him. Appellant started swinging the hammer. Clinton was really close to him and tried to grab the hammer. Appellant could not say how many times he hit Clinton in the head. After appellant hit him, Clinton fell forward near the wall. He fell all the way to the ground, but then got up on all fours. Appellant started swinging again because he was scared. Appellant hit Clinton again in the back of the head. He did not know how many times. Clinton dropped down flat on the ground, and appellant kept hitting him. When he thought Clinton was dead, appellant put pillows and blankets on top of Clinton so he would not have to see him. Appellant did not call the police. He testified that people in the Five Points area do not trust the police. Before he left for Mexico, appellant threw the hammer in a nearby river. Appellant testified that Clinton was the first aggressor. He testified he caused the death of Clinton to protect himself and did not feel like he had another option.

According to appellant's trial testimony, Clinton was not making loud screaming noises, and appellant never used a pillow to smother him. He did not attack Clinton while Clinton slept. They did not watch movies on appellant's cell phone. Appellant did not recall being interviewed by Homeland Security or by the FBI. He did not recall telling them that Clinton stayed behind in his apartment and they watched movies. He did not recall telling them that he hit Clinton while he was asleep.

Constant testified that on the morning of March 23, 2014, he was with Assefa and Clinton and they were smoking a K2 blunt. Clinton was his good friend. Some time that afternoon, appellant approached them by a store named Bonito's. The group walked to an apartment a few minutes away, and Clinton purchased PCP. Constant testified that Assefa, Clinton, and appellant smoked the PCP. They later went to appellant's apartment. Constant

stayed in appellant's apartment about thirty minutes because Clinton "started tripping." Constant knew something was not right. Clinton grabbed appellant and "tussled him up." Constant and Assefa got Clinton off of appellant. They splashed some water on Clinton's head to calm him down. At some point, Clinton hit the window with his hand. Constant and Assefa left the apartment.

Constant testified that before Clinton started beating on appellant, appellant was "making gay advances" toward him. Constant testified he did not know why Clinton started hitting appellant; he did not know if it was due to the advances. Constant testified that all four men left the apartment at about 9:00 p.m. The last time Constant saw Clinton was not in appellant's apartment; it was behind a nearby church. When they were all four at the church, everyone was peaceful.

On cross-examination, Constant denied telling Detective Chaney that Clinton hit appellant. Appellant was not hurt as a result of the altercation. Constant admitted that Clinton was his friend and that he did not like appellant.

The defense next called Detective Chaney as a witness. He testified he interviewed Constant and Constant did not mention any homosexual advances made by appellant. In his investigation, he was told Clinton initiated the altercation and that Clinton beat appellant.

The trial court instructed the jury on self-defense in the charge. The jury found appellant guilty of murder. At punishment, the jury found that appellant did not cause Clinton's death while under the immediate influence of sudden passion arising from an adequate cause. The jury assessed appellant's punishment at twenty-five years' confinement. This appeal followed.

## SELF-DEFENSE

In his first issue, appellant challenges the sufficiency of the evidence to support the jury's rejection of self-defense. He contends that the evidence is factually insufficient to support the

jury's rejection of self-defense and argues the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. As explained below, the appropriate standard by which to review a jury's rejection of self-defense is the *Jackson v. Virginia* standard. *See Smith v. State*, 355 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Jackson v. Virginia*, 443 U.S. 307 (1979).

Self-defense is a defense to prosecution under penal code section 2.03. *Smith*, 355 S.W.3d at 144; *see* TEX. PENAL CODE ANN. §§ 2.03, 9.31, 9.32 (West 2011). A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. TEX. PEN. CODE ANN. § 9.31(a). Deadly force in self-defense is justified when a person reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a).

The issue of self-defense is an issue of fact to be determined by the jury. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). A defendant has the burden of producing some evidence to support a claim of self-defense. *Smith*, 355 S.W.3d at 144 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)). Once the defendant produces such evidence, the State bears the ultimate burden of persuasion to disprove self-defense. *Id.* The burden of persuasion does not require the State to produce evidence, but it requires that the State prove its case beyond a reasonable doubt. *Id.* For this reason, in resolving an issue about the sufficiency of the evidence of self-defense, we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of murder beyond a reasonable doubt and also could have found against appellant on

–8–

the self-defense issue beyond a reasonable doubt.[2]  *Saxton*, 804 S.W.2d at 914; *Smith*, 355 S.W.3d at 145.  The jury resolves any conflicts in the testimony and determines the credibility of the witnesses and the weight to be given to their testimony.  *Gaona v. State*, 498 S.W.3d 706, 709 (Tex. App.—Dallas 2016, pet. ref'd).

Appellant's argument is not about the evidence of his use of deadly force and whether it was reasonably necessary.  Instead, he argues that the State's theory that he hit Clinton while he slept is not supported by the evidence, citing testimony from the medical examiner and the bloodstain expert, as well as Constant's testimony that all four men left the apartment together.  The jury heard two versions of how Clinton died that night, both originating from appellant.  When appellant spoke to law enforcement officers at the border shortly after Clinton's death, he did not mention self-defense.  He told them that he hit Clinton in the head with a hammer while he slept.  The jury as factfinder was free to disbelieve appellant's testimony at trial over two years later that he acted in self-defense after Clinton hit him and followed him into his apartment.  Further, in rejecting appellant's claim of self-defense, the jury was entitled to consider appellant's actions in disposing of the weapon and fleeing to Mexico.  *Valverde v. State*, 490 S.W.3d 526, 529–30 (Tex. App.—San Antonio 2016, pet. ref'd); *see Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (factfinder may draw an inference of guilt from circumstance of flight).  After viewing all the evidence in the light most favorable to the prosecution, we conclude any rational trier of fact could have found the essential elements of murder beyond a reasonable doubt and also could have found against appellant on the self-defense issue beyond a reasonable doubt.  We overrule appellant's first issue.

---

[2] To support his assertion that a factual sufficiency challenge may be made to the jury's rejection of self-defense, appellant cites *Butcher v. State*, 454 S.W.3d 13 (Tex. Crim. App. 2015).  *Butcher* did not involve self-defense.  It was a kidnapping case that involved the mitigating defense of release in a safe place, which the court of criminal appeals treated as an affirmative defense and evaluated for factual sufficiency.  *Id.* at 20.  Self-defense is a defense under penal code section 2.03, not an affirmative defense.  *Saxton*, 804 S.W.2d at 912 n.5.

## SUDDEN PASSION

In his second issue, appellant contends the jury's rejection of sudden passion was so against the great weight and preponderance of the evidence as to be manifestly unjust. We disagree.

Murder is a first-degree felony. TEX. PENAL CODE ANN. § 19.02(c). At the punishment phase of a murder trial, the defendant may raise the issue of whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. *Id.* § 19.02(d). If the defendant proves the issue by a preponderance of the evidence, the offense is a felony of the second degree. *Id.* "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed which passion arises at the time of the offense and is not solely the result of former provocation. *Id.* § 19.02(a)(2). "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. *Id.* § 19.02(a)(1).

Although the issue of sudden passion is a punishment issue, it is analogous to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence. *Gaona*, 498 S.W.3d at 710. For this reason, a finding on sudden passion may be reviewed for factual sufficiency. *Id.* When we review a jury's rejection of an issue on which the defendant had the burden of proof by a preponderance of the evidence, the standard of review is whether, after considering all the evidence relevant to that issue, the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Naasz v. State*, 974 S.W.2d 418, 421 (Tex. App.—Dallas 1998, pet. ref'd) (citing *Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990)).

Appellant asserts that his testimony was more consistent with the physical evidence than the State's version of the events. Appellant maintains he killed Clinton after Clinton struck him

in the back of the head and followed him into his apartment without permission. According to appellant, he panicked and attacked Clinton while fearing he was going to lose his life. Appellant also said he could not remember how many times he struck Clinton, which he asserts shows he was acting in a frenzy or rage. Appellant contends Clinton's multiple acts of aggression provoked him and produced a degree of anger, rage, or resentment sufficient to render his mind incapable of cool reflection.

Although the blood spatter expert could not rule out that the victim was first standing up, the evidence was consistent with the source of blood being between the height of the floor and the outlet. The issue of whether appellant acted under the immediate influence of sudden passion hinged on the jury's evaluation of appellant's credibility, and we defer to the jurors' resolution of the issue. They were free to disbelieve appellant's testimony that Clinton had struck him in the head right before he got the hammer and that he acted out of panic and fear. The jury could have chosen to instead believe appellant's statement, made soon after Clinton's death, that appellant attacked Clinton while he slept on the floor, which was consistent with the physical evidence. After reviewing the evidence, we cannot conclude the jury's finding that appellant did not act under the immediate influence of sudden passion arising from an adequate cause is so against the great weight and preponderance of the evidence as to be manifestly unjust. We overrule appellant's second issue.

## EXCLUSION OF EVIDENCE

In his third issue, appellant contends the trial court abused its discretion in excluding evidence that was relevant to his claim of self-defense. He complains of the trial court's refusal to allow him to develop testimony about the Illuminati. Agent Bostic testified that the Illuminati is a cult that is supposed to believe in new world order and is comprised of the elite and rich of

the world. Although not entirely clear from the record or the appellant's brief, it appears appellant wanted to present evidence that the Illuminati is a Dallas gang.

Prior to Constant's testimony for the defense, the State asked that Constant not be permitted to give any character evidence that the court had not yet ruled on, such as testimony about the Illuminati or gang affiliation. The court had previously reserved ruling on this issue until after appellant testified. Appellant's counsel mentioned that Constant had said in an interview that Clinton was "throwing down Illuminati signs" during his altercation with appellant. Defense counsel asserted the evidence was res gestae of the offense rather than character evidence. According to the defense, it was contextual evidence. The State responded that Constant was not present when the murder took place and had no personal knowledge of the events. The prosecutor argued that the desired testimony was being used to show character conformity. The court ruled it would allow discussion of the physical altercation, but no mention of the Illuminati.

During appellant's testimony, he mentioned that Clinton told him, "[L]et's do it for the Illuminati." The court then went off the record and instructed appellant he was not allowed to talk about the Illuminati in front of the jury. The court allowed the defense to make an offer of proof about the gang evidence it sought. Appellant stated he knew Clinton was in a gang and that he had seen him fighting on the street. Appellant said this caused him concern when Clinton was coming at him. Appellant stated he knew Clinton was "a blood." When Clinton was beating appellant, Clinton said, "[L]et's do it for the Illuminati." At the conclusion of the offer of proof, the court ruled appellant could not talk about the Illuminati.

Appellant now contends that because the State introduced the subject of the Illuminati during the testimony of Bostic and Lozano, it opened the door for appellant to develop testimony about the nature of that comment and how it related to his self-defense claim. Appellant did not

argue in the trial court, however, that the evidence should be admitted because the State opened the door. Appellant gave various reasons why the evidence he sought was admissible. He argued it was admissible because it was res gestae, contextual evidence, and was relevant to appellant's state of mind. Appellant also argued that not being allowed to question Constant on the topic deprived him of his right to present a defense and his right to confront the witness. As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court. *See* TEX. R. APP. P. 33.1(a). Further, the record must show the trial court ruled on the request or refused to rule. *Id.* Appellant did not give the trial court the opportunity to rule on the argument he now makes. He has failed to preserve this issue for appellate review. We overrule appellant's third issue.

### ALLOCUTION

In his fourth issue, appellant contends the trial court denied him his common-law right to allocution. Appellant acknowledges that the trial court complied with the statute pertaining to allocution by asking if there was any legal reason sentence should not be imposed. *See* TEX. CODE CRIM. PROC. ANN. art. 42.07 (West 2006) (before pronouncing sentence, defendant shall be asked whether he has anything to say why sentence should not be pronounced against him). Appellant complains of the trial court's failure to inquire if he wished to exercise his common-law right to allocution or had anything to say beyond the limited reasons in article 42.07 why sentence cannot be pronounced. *See id.* Appellant has failed to preserve this issue for appellate review. Again, as a prerequisite to presenting a complaint for appellate review, the record must show that the specific complaint was made to the trial court. *See* TEX. R. APP. P. 33.1(a). Appellant did not object at trial on grounds he was denied his common-law right of allocution and raises this issue for the first time on appeal. He has failed to preserve error. *See Norton v.*

*State*, 434 S.W.3d 767, 771 (Tex. App.—Houston [14th Dist.] 2014, no pet.).  We overrule appellant's fourth issue.

We affirm the trial court's judgment.


/Ada Brown/
ADA BROWN
JUSTICE


Do Not Publish
TEX. R. APP. P. 47.2(b).

160810F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MYO NAING SWE, Appellant

No. 05-16-00810-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 282nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1475492-S.
Opinion delivered by Justice Brown, Justices Francis and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 17th day of July, 2017.